ALAN L. ISAACMAN, Bar no. 42273
STEVEN H. BLACKMAN, Bar no. 93528
ISAACMAN, KAUFMAN & PAINTER, P.C.
10250 Constellation Blvd., Suite 2900
Los Angeles, CA 90067
Tel: (310) 881-6800
Fax: (310) 881-6801
isaacman@ikplaw.com
blackman@ikplaw.com

Attorneys for Plaintiff
Colorado Satellite Broadcasting, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLORADO SATELLITE BROADCASTING, INC., a Colorado corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>FRIENDFINDER NETWORKS, INC., PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC., and PENTHOUSE ENTERTAINMENT,<br><br>       Defendants. | CASE NO. CV11-10068 PSG (Ex)<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Colorado Satellite Broadcasting, Inc. ("CSB") hereby alleges as follows:

## INTRODUCTION

1. This is an action between citizens of different states, in which the amount in controversy exceeds $75,000. This Court has original jurisdiction over this matter under 28 U.S.C. 1332.

2.  CSB is a corporation, incorporated in the State of Colorado, with its principal place of business in Colorado.  CSB does business in the Central District of the State of California.

3.  Defendant FriendFinder Networks, Inc. ("FFN") is a corporation, incorporated in the State of Nevada.  FFN's principal place of business is in the State of Florida.  Plaintiff is informed and believes and thereon alleges that FFN does business in the Central District of the State of California.

4.  Defendant Penthouse Digital Media Productions, Inc. ("PDMP") is a corporation, incorporated in the State of New York.  Plaintiff is informed and believes and thereon alleges that PDMP's principal place of business is in the State of Florida and that PDMP does business in the Central District of the State of California.

5.  Defendant Penthouse Entertainment ("PE") is an entity the form of which is unknown to Plaintiff.  Plaintiff is informed and believes and thereon alleges that PE is a citizen of the State of Nevada, New York or Florida and that it does business in the Central District of the State of California.

6.  Plaintiff is informed and believes and thereon alleges that FFN, PDMP and PE are alter egos of one another.  FFN is the parent corporation of PDMP, PE and other entities, and the same control group exercises control over all defendants.  Plaintiff is informed and believes and thereon alleges that Defendants have commingled their finances and have failed to comply with corporate formalities such that any separation between these has, in fact ceased to exist.

7.  In or about September 2007, CSB and PDMP entered into a written License Agreement, a copy of which is attached hereto.  CSB has complied with its obligations pursuant to the License Agreement.  However, notwithstanding such compliance, Defendants have asserted a breach by CSB and have purported to terminate the License Agreement.  Accordingly, CSB seeks a declaration of its rights under the License Agreement, including a declaration that the purported termination is without basis and of

2
COMPLAINT

1 no force or effect; CSB further seeks an award of damages, including attorneys' fees, as a

2 result of the purported termination, which constitutes an anticipatory breach of the License

3 Agreement.

4      8.  The assertions of breach by CSB are in fact a guise, covering Defendants' own

5 breach of the License Agreement and their acts in violation of CSB's contract rights.

6 Thus, Defendants have attempted to grant to third parties a license to certain films, even

7 though CSB was granted an exclusive license to those films in the License Agreement.

8 CSB seeks a declaration of its rights and an award of damages with respect to PDMP's

9 efforts to grant licenses to these films.

10

11 <u>JURISDICTION AND VENUE</u>

12      9.  CSB is a citizen of the State of Colorado.  Plaintiff is informed and believes and

13 thereon alleges that FFN, PDMP and PE are citizens of the States of New York, Nevada

14 and/or Florida.  The amount in controversy exceeds $75,000, exclusive of interest and

15 costs.

16      10.  All defendants do business in the Central District of the State of California, and

17 therefore venue is appropriate in this District.

18      11.  The License Agreement provides that it is to be governed by the laws of the

19 United States and of the State of California.  The License Agreement further provides that

20 any dispute between the parties shall be resolved in the state or federal courts physically

21 located within the State of California and that the parties submit themselves to the sole and

22 exclusive venue and jurisdiction of the courts therein "without protest or challenge".  (Lic.

23 Agr., para. 20.)

24

25

26

27

28

## FIRST CLAIM FOR RELIEF

(Declaratory Relief)

12. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 11, above, as if fully set forth herein.

13. In or about September 2007, CSB and PDMP entered into a written License Agreement, a copy of which is attached hereto as Exhibit A. The License Agreement was modified pursuant to a written modification, a copy of which is attached as Exhibit B.

14. CSB has complied with the material obligations imposed on it pursuant to the License Agreement. However, notwithstanding such compliance, PDMP has asserted a breach by CSB and has purported to terminate the License Agreement. PDMP's assertions of breach are false and without merit, and therefore, PDMP has no basis for terminating the License Agreement.

15. Pursuant to the License Agreement, CSB obtained a number of rights. As more fully set forth in the License Agreement, the rights granted to CSB include the following:

• The exclusive right to distribute "Titles" (certain motion pictures as defined by the License Agreement) via "Broadcast Formats" (which include any form of broadcast) within the "Territory" (including the United States);

• The exclusive right to establish, launch and operate a PDMP branded VOD (video on demand) service within the Territory;

• The exclusive right to establish, launch and operate a PDMP branded linear channel service within the Territory;

• The exclusive right to establish, launch and operate a PDMP re-branded linear channel service within the Territory; and

• The exclusive right to use "Trademarks" (including the name and style of the "Penthouse" mark), in connection with the above rights.

16. As a result of the foregoing grants of rights, CSB has exclusive rights in the United States to distribute "Penthouse" titles via any form of broadcast (as set forth in the

License Agreement), to operate a "Penthouse" VOD service, to operate a "Penthouse" cable television channel, and to use the "Penthouse" trademark in connection with these forms of distribution. (This is an illustrative, and not exhaustive, list of rights granted to CSB under the License Agreement.)

17. By virtue of its purported termination, PDMP claims to have terminated CSB's exclusive rights under the contract, including those set forth above. In fact, PDMP has no right to terminate CSB's exclusive rights. Accordingly, there is an actual controversy between CSB and PDMP regarding CSB's rights under the License Agreement, as CSB contends that it continues to have the rights granted to it under the License Agreement, including the rights described above, and PDMP contends that it has terminated the License Agreement and that CSB does not have the rights granted to it under the License Agreement. CSB seeks a declaration of its rights under the contract.

18. The License Agreement provides for an award of costs and attorneys' fees to the prevailing party in the event of any dispute between the parties.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

19. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 18, above, as if fully set forth herein.

20. In or about March 2011, Defendants attempted to distribute "3-D" versions of "Penthouse" Titles and/or establish a "Penthouse" branded channel in the United States for the distribution of 3-D Titles, in violation of the exclusive rights granted to CSB. CSB is informed and believes and thereon alleges that, since March 2011, Defendants have continued their efforts to distribute 3-D "Penthouse" Titles and/or establish a 3-D "Penthouse" branded channel in the United States, in violation of the exclusive rights granted to CSB.

21.  There is an actual controversy between CSB and Defendants regarding the rights of the parties under the License Agreement, as CSB contends that it has the exclusive right under the License Agreement to distribute 3-D "Penthouse" Titles in the United States (as the term "Titles" is defined in the License Agreement), and to operate a VOD service and linear channel in the United States on which such 3-D "Penthouse" Titles are made available.  Defendants contend that they have the right to engage in such distribution and operate such VOD service and linear channel.  CSB seeks a declaration of its rights under the contract.

### THIRD CLAIM FOR RELIEF

(Breach of Contract)

22.  Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 21, above, as if fully set forth herein.

23.  CSB and PDMP are parties to a written License Agreement, a copy of which is attached hereto as Exhibit A, and a written modification, a copy of which is attached as Exhibit B.

24.  CSB has complied with the material obligations imposed on it pursuant to the License Agreement.

25.  PDMP has breached the License Agreement by its purported termination, which constitutes an anticipatory breach of the agreement, and by its participation in the efforts to distribute 3-D "Penthouse" Titles, or establish a VOD service or linear channel, in the United States.

26.  PDMP's actions in breach of the contract have caused, and will continue to cause confusion in the market place, which damage CSB's ability to exercise its exclusive rights to distribute "Penthouse" Titles, and to operate PDMP branded VOD services and linear channels.  Among other things, PDMP's actions in breach of the contract have caused and will continue to cause CSB to incur expenses in order to deal with this

confusion and avoid greater damages that would occur if a cable operator refused to carry CSB's "Penthouse" Titles, its PDMP branded VOD services or its PDMP branded (or re-branded) linear channels. CSB will suffer vastly greater damages, if PDMP's repudiation of the License Agreement results in the actual refusal of one or more cable operators to carry CSB's "Penthouse" Titles, its PDMP branded VOD services or its PDMP branded (or re-branded) linear channels. CSB is informed and believes and thereon alleges that PDMP's actions in breach of the contract have caused or will cause damages in excess of $75,000.

<u>PRAYER</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A.  That the Court declare that the License Agreement has not been terminated, and that CSB retains all rights granted to it thereunder;

B.  That the Court declare that CSB has the exclusive right to distribute 3-D versions of Titles (as defined in the License Agreement), to operate VOD services which make available such Titles, to operate PDMP-branded or re-branded linear channels which make available such Titles, and to engage in all other exclusive rights provided in the License Agreement with respect to 3-D Titles, just as with respect to Titles which are not in the 3-D format; and that the Court further declare that Defendants do not have such rights.

C.  That the Court award damages in favor of CSB and against Defendants in a sum to be determined in accordance with proof, but which is in excess of $75,000;

D.  For interest at the legal rate;

E.  For reasonable attorneys' fees;

//
//
//

F.  For costs of suit incurred herein; and

G.  For such other and further relief as the Court may deem just.

DATED: December 5, 2011          ALAN L. ISAACMAN
                                 STEVEN H. BLACKMAN
                                 ISAACMAN, KAUFMAN & PAINTER
                                 A Professional Corporation

                                 By: _____
                                       STEVEN H. BLACKMAN
                                 Attorneys for Plaintiff Colorado Satellite
                                 Broadcasting

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands jury trial of all issues for which a jury trial is available.

DATED: December 5, 2011          ALAN L. ISAACMAN
                                 STEVEN H. BLACKMAN
                                 ISAACMAN, KAUFMAN & PAINTER
                                 A Professional Corporation

                                 By: _____
                                       STEVEN H. BLACKMAN
                                 Attorneys for Plaintiff Colorado Satellite
                                 Broadcasting

EXHIBIT A

## LICENSE AGREEMENT

This License Agreement (the "Agreement") is made and entered into as of this 6 day of September 2007 (the "Effective Date") by and between: **PENTHOUSE DIGITAL MEDIA PRODUCTIONS INC.**, located at 6800 Broken Sound Pkwy NW, Suite 100, Boca Raton, FL 33487 ("PDMP") and **COLORADO SATELLITE BROADCASTING, INC.**, located at 7007 Winchester Circle, Suite 200, Boulder, CO 80301 ("CSB").

WHEREAS, PDMP owns or controls exclusive rights to a number of motion pictures and related content intended for viewing by adult audiences;

WHEREAS, CSB performs, displays and broadcasts motion pictures and other content intended for viewing by adult audiences; and

WHEREAS, CSB desires to obtain from PDMP, and PDMP desires to grant to CSB, the right to publicly perform, display and broadcast certain of said motion pictures, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, the parties agree as follows:

1.    **DEFINITIONS**
As used in this Agreement, certain capitalized terms not otherwise defined in the body of the Agreement shall have the following meanings:

1.01    "Broadcast Formats" means all forms of broadcast whether now known or hereinafter devised including but not limited to (i) broadcast television (including but not limited to Pay-Per-View, Video-on-Demand, free terrestrial television, pay television, cable television, and DSS); (ii) satellite television (including but not limited to closed circuit television, including SMATV, digital broadcast satellite systems, C-Band satellite direct to home systems, and scrambled low power television stations); and (iii) the digital Downloading and streaming to a consumer appliance whose primary or sole purpose is to receive streamed or Downloaded audiovisual content, commonly referred to as "IPTV" (and excluding personal computers, mobile phones, and similar devices) or CSB's own proprietary software over a closed Internet infrastructure. For the avoidance of doubt, distribution of Titles to a Person via the Internet other than as specifically described herein is not included.

1.02    "Content" means text, graphics, promotional materials, video, including without limitation, behind the scenes segments or DVD extras, audio, music and/or other data or information contained in or related to a Title and any images contained in the following media or medium: negatives, prints, transparencies, slides, chromes, and digital images in any and all formats, Internet-based images capable of transfer in any protocol, and all other formats (including, without limitation, VHS, DVD and/or any other technical formats) and/or transfer protocols now known or hereafter created or discovered, depicting, or promoting a Title and any Persons appearing in a Title whether such images are actually depicted in a Title or created separately for the purposes of advertising and/or publicizing a Title.

1.03    "CSB Re-Branded Linear Channel Service" means any existing CSB branded linear channel service that has been re-named by CSB using a Trademark as its new network name. Such Re-Branded Linear Channel Service shall be distributed using a XX or greater editing standard only.

1.04    "Documentation" means: (i) any and all documentation required by U.S. law or regulation, including without limitation copies of photo identification reflecting the age of each individual appearing in each Motion Picture or any related Content at the time of production, and all related documentation required by 18 U.S.C. §2257 and 28 C.F.R., Part 75, as amended from time to time; and (ii) talent releases containing all customary consents, representations, and waivers (including without limitation waivers of claims based on rights of privacy, publicity, and false light) signed by each individual appearing in each Title.

INITIALS:    PDMP _____    CSB _____

Page 1 of 18

1.05    "Downloading" means to copy data from a source to a peripheral device.

1.06    "Dub" means a broadcast quality first generation copy of an Edit Master in its native language and, when available, in the English language that is electronically stored, and that is furnished by PDMP in compliance with the specifications set forth in Schedule B, which is attached hereto and incorporated herein by this reference.

1.07    "Edit Master" means the original version of a Title, created exclusively from original camera footage shot in connection with a Title.

1.08    An audiovisual work or other title is not "eligible for use" by CSB as a Title pursuant to this Agreement if it has received an R or NC-17 rating from the MPAA, or TV-MA, L and/or S television ratings, or if rights of the kind granted to CSB pursuant to this Agreement are already granted or reserved (for non-limiting example, subject to a license or a holdback) as concerns such Title prior to the Effective Date or prior to PDMP's acquisition date if acquired after the Effective Date from a Person.   CSB acknowledges that Titles delivered by PDMP to INDemand L.L.C. pursuant to its license agreements therewith are not eligible for use.   PDMP may deliver such audiovisual works or other titles as Titles pursuant to this Agreement at PDMP's discretion upon their becoming eligible for use.

1.09    "Exhibit" or "Exhibition" means to publicly display, publicly perform, transmit, sell, sublicense, distribute, Download, stream or otherwise make available a Title via a Broadcast Format.

1.10    "Event" means any adult oriented or themed "live" or event-based content, whether or not such content has received an MPAA rating, that contains a level of explicitness that is similar to programming exhibited on Dish Network's PPV event channels, 481-484, such as "Jerry Springer Uncensored", "Girls Gone Wild" and "Hot Bodies". Such Event programming may include, but is not limited to, one or more of the following: (a) general nudity (shots showing nudity without any sexual situation); (b) nudity accompanied by implied sexual acts; (c) chest area close shots; and/or (d) implied sexual acts of any kind.

1.11    "Home Video" means the distribution and exploitation of Titles embodied in a videocassette, videodisc, DVD or CD-ROM, or in other now or later-developed tangible media formats, whether via sale or rental to the viewer for home use only.

1.12    "Incremental Revenues" means all revenues received during a given period by CSB and its affiliates per Subscriber on the Re-Branded Linear Channel Service minus the average revenue received during the same period by CSB and its affiliates per Subscriber on all other channels (but excluding other PDMP branded linear channel services) provided by CSB and its affiliates on the same Provider as verified by a 3rd party auditor mutually selected by the parties.

1.13    "Internet" means the global network of interconnected computer networks utilizing the Transmission Control Protocol/Internet Protocol (TCP/IP), and/or such other standard network interconnection protocol(s) as may be adopted from time to time, to transmit data to a computer or other digital electronic device for display to an end user.

1.14    "Launch Costs" means the direct, actual and reasonable costs incurred in connection with launching either a PDMP Branded Linear Channel Service or a CSB Re-Branded Linear Channel Service. For purposes of calculating payments due to PDMP pursuant to this Agreement, Launch Costs shall not exceed $500,000 per PDMP Branded Linear Channel Service or CSB Re-Branded Linear Channel Service.

1.15    "License Period" shall have the meaning given to the term in Section 5.2, below

1.16    "Minimum Payment Guarantee" shall have the meaning given to the term in Section 7.1(a), below.

INITIALS:     PDMP _____     CSB _____

1.17    "Pay Per View" means the Exhibition of a Title to a Subscriber via any Broadcast Format where a charge is made to such Subscriber for the right to use a decoding device to view the Exhibition of the Title at a time designated by the Provider for each viewing.

1.18    "PDMP Branded Linear Channel Service" means any new linear channel service that is distributed to a Provider by CSB using a Trademark as its network name. Such PDMP Branded Linear Channel Service shall be distributed using a XX or greater editing standard only.

1.19    "PDMP Branded VOD Services" means a new or existing Video on Demand service that uses a Trademark as its channel name.

1.20    "Penthouse Pet" or "Pet" means any female model who has appeared in "Penthouse Magazine" and has been named a "Pet of the Month" or "Pet of the Year".

1.21    "Person" means any natural person, legal entity, or other organized group of persons or entities, with the exception of CSB and PDMP. (All pronouns, whether personal or impersonal, which refer to Persons, include natural persons and other Persons.)

1.22    "Provider" means a video content distributor that Exhibits programming using any of the Broadcast Formats.

1.23    "Rights" shall have the meaning given to the term in Section 2.1, below

1.23    "Subscriber" means any Person who receives any service from a Provider on terms constituting a Subscription, Video on Demand or Pay Per View purchase, excluding: (i) the Provider itself; (ii) any Person who charges an admission fee, cover charge, minimum or like; (iii) any illegal connection not authorized by a Provider; and (iv) any Person who distributes all or any part of a program to viewers who are not located in the same residence, dwelling unit, store, hospital room, hotel room or suite, motel room or suite, office or other singular facility occupied, owned, leased or otherwise controlled by the Person entitled to receive the programming.

1.24    "Subscription" means the broadcast to and reception of a Title at a location on a monthly basis and/or any other basis that does not constitute a single Pay Per View or Video on Demand purchase, by means of a Provider.

1.25    "Term" means the term specified in Section 5.1 below and any extensions agreed to by the parties hereto in accordance with the terms hereof.

1.26    "Territory" includes only the following: (i) United States and its territories and possessions (including, without limitation, U.S. Virgin Islands and Puerto Rico); and (ii) solely as and to the extent that then-current technological infrastructure and delivery systems render limitation or exclusion impracticable for such locales, then Guam, Bermuda, and all U.S. commonwealths, instrumentalities, embassies, military bases, and vessels including those in foreign countries.  CSB acknowledges that the rights granted pursuant to clause (ii) are non-exclusive.

1.27    "Title" means an adult themed motion picture or motion picture segment branded under a Trademark that is at least fifty four (54) minutes in length with a rating of XX or greater or, subject to the rights and obligations set forth herein, an "Event".  Each Title shall include all related Content, Versions and formats of each such Title. All Titles shall meet CSB's reasonable and customary written technical specifications delivered to PDMP, and shall be of substantially the same or better quality as the following PDMP branded titles: "Power Play", "Sex to Die For", "Killer Klub Girlz", "Brazilian Heat", "Slave to Sin", "Raunchy Rio", "Slick", "Penthouse Variations: Uniform Behavior", "Out of Control", "My First Girlfriend", "Penthouse Letters Dripping Wet", and "Penthouse Variations: Bad 2 the Bone."

1.28    "Trademarks" means all registered and common law names, trademarks, service marks,

INITIALS:   PDMP _____   CSB _____

trade names, trade dress, or logos owned or licensed by PDMP, including without limitation, the name and style of the Penthouse word mark, the Penthouse Keys, Penthouse Video, Penthouse Centerfold, Penthouse Pets, Pet of the Month, Pet of the Year, The Penthouse Club, the One-Key Logo and the Three-Key Logo and related trademarks, as well as the JILL KELLY PRODUCTIONS and JKP trademarks.

1.29    "Version" means any version of a Title that is created by CSB from a Dub.  Copyright in all Versions shall be deemed owned exclusively by PDMP (as works made for hire, to the extent permissible by applicable law, and otherwise irrevocably assigned in perpetuity to PDMP in all media now or hereafter existing) and licensed to CSB pursuant and otherwise subject to all terms of this Agreement; provided that CSB and not PDMP shall be responsible for all modifications effected and elements added to Titles by CSB and its affiliates.

1.30    "Video on Demand (VOD)" shall mean the Exhibition of a Title to a Subscriber via a Broadcast Format where a charge is made to the Subscriber for the right to decode and electronically store a Title which in turn enables such Subscriber to manipulate the Exhibition of Titles at the Subscriber's discretion including but not limited to pausing, reversing, forwarding and stopping the Exhibition.

1.31    "X", "XX" & "XXX" means the edit standards set forth in Schedule C, which is attached hereto and incorporated herein by reference.

## 2.   GRANT OF RIGHTS

2.1    PDMP hereby grants to CSB the following rights (collectively, the "Rights") during the License Period (as defined below) and subject to the terms and conditions contained herein:

(a)    The exclusive right and license (but not the obligation) to distribute Titles via Broadcast Formats within the Territory;

(b)    The exclusive right and license to establish, launch, and operate a PDMP Branded VOD Service within the Territory;

(c)    The exclusive right and license to establish, launch, and operate a PDMP Branded Linear Channel Service within the Territory;

(d)    The exclusive right and license to establish, launch, and operate a CSB Re-Branded Linear Channel Service within the Territory;

(e)    The right and license to duplicate Titles for distribution via Broadcast Formats within the Territory;

(f)    The exclusive right and license to publicize, advertise and exploit the Rights granted to CSB hereunder and to cause or permit others to do so, subject to the provisions set forth herein.

(g)    The non-exclusive right and license solely for the purpose of advertising, publicizing and promoting the rights herein granted to CSB in the Titles, subject to any restrictions or conditions by which PDMP is contractually bound, the right to publish or cause to be published synopses, summaries and resumes of the Titles in all advertising media; to use the name, approved likeness and approved biography of any performer rendering services in connection with the Titles; to use the name and approved likeness of the director, producer and screenwriter; and to use the names of such Titles, music recorded in such Titles and artwork and design used in connection with such Titles;

(h)    The non-exclusive right to edit and modify each of the Titles hereunder in order to create derivative Versions or to the extent necessary to meet the specifications set forth in

INITIALS:   PDMP ⟨initials⟩   CSB ⟨initials⟩

Schedule B or to meet any time, length and programming standards, in CSB's sole discretion; and

(i)       The exclusive right and license to use the Trademarks within the Territory solely in connection with and necessarily incident to the exploitation of the exclusive Rights set forth in this Section 2.   CSB shall not make or have made any merchandise, premiums or similar promotional items bearing a Trademark without PDMP's prior written consent, granted or withheld in PDMP's reasonable discretion.

2.2    Notwithstanding CSB's exclusive rights set forth in Section 2.1(f), PDMP shall have the right to publicize and advertise the PDMP Branded VOD Service, PDMP Branded Linear Channel Service and the CSB Re-Branded Linear Channel Service, including the Trademarks associated therewith in all media (i) for uses directed solely or primarily to publicizing and advertising the Services, once it has obtained CSB's prior written approval of such marketing materials, such approval not to be unreasonably withheld or delayed; and (ii) for uses otherwise directed, including by way of example and without limitation communications and materials delivered to actual and prospective PDMP investors and materials promoting the Company and its products and services generally, in PDMP's sole discretion.

2.3    PDMP reserves all other rights not granted to CSB in this Agreement, at law or in equity.

2.4    CSB shall use commercially reasonable best efforts to exploit the exclusive Rights herein granted by PDMP, and shall do so diligently, conscientiously and consistent with industry standards in all media licensed pursuant to this Agreement and to maximize profits, such commitment being of the essence of this Agreement and a material inducement to PDMP to enter into this Agreement.

2.5    Notwithstanding any other provision of this Agreement, distribution of Titles or portions thereof via (i) the Internet (other than digital Downloading and streaming of Titles to a consumer appliance whose primary or sole purpose is to receive streamed or Downloaded audiovisual content, commonly known as "IPTV," but excluding personal computers, mobile phones, and similar devices) or CSB's own proprietary software over a closed Internet infrastructure); (ii) mobile communication devices, mobile and/or cellular phone; (iii) Home Video Formats; and (iv) both terrestrial and satellite radio are specifically excluded from the Rights granted to CSB pursuant to this Agreement.  PDMP may in its sole discretion permit CSB to promote the Services (defined in Section 3.1) via such means upon CSB's request from time to time.  The foregoing restrictions shall not limit CSB's Rights pursuant to Section 2.1(f).

3.    **CSB OBLIGATIONS**
3.1    CSB shall have the obligation to launch the following services within the timeframes established herein (collectively, the "Services"):

(a)       PDMP Branded VOD Service.   CSB shall establish, launch, and continue operation of a PDMP Branded VOD Service on one or more Providers having at least ten million Subscribers in the aggregate beginning prior to the 1st anniversary of the Effective Date.

(b)       Linear Channel Service.  In addition to its obligation to establish, launch and continue operation of a PDMP Branded VOD Service, CSB shall also launch one of the following linear channel services on one or more Providers having at least ten million Subscribers in the aggregate by the applicable due dates set forth below:

(i)       PDMP Branded Linear Channel Service.   CSB shall enter into agreement(s) with Provider(s) for a PDMP Branded Linear Channel Service prior to the 2nd anniversary of the Effective Date and shall launch and continue operation of such service by the 3rd anniversary hereof; or

(ii)       CSB Re-Branded Linear Channel Service.   CSB shall enter into agreement(s) with Provider(s) to create, launch and continue to operate a CSB Re-

INITIALS:    PDMP ____    CSB ____

Page 5 of 18

Branded Linear Channel Service within thirty (30) months from the Effective Date.

3.2     Each of the Services described above shall include licensed Titles and may also include non-PDMP titles of substantially similar or greater quality that shall be furnished by CSB at CSB's expense. The PDMP Branded VOD Service may in CSB's discretion, include Event content and such Event content shall be subject to the same revenue splits as set forth in Section 7.1(a). The parties acknowledge that the Services described above are conditioned upon certain agreements with one or more Providers that are not under CSB's control. Accordingly, PDMP's rights in the event of CSB's failure to meet any of the deadlines set forth herein or to maintain such Services for the entire Term arising solely from such Provider's actions notwithstanding CSB's use of commercially reasonable best efforts to achieve and maintain such agreements with such Providers are limited to terminating CSB's right to continue offering the applicable Service during the Term. Additionally, CSB shall have the following limited Service termination rights following an audit conducted by an independent and neutral 3rd party mutually selected by the parties: (a) if such 3rd party determines that CSB and its affiliates have not received any Incremental Revenues as a result of the operation of a CSB Re-Branded Linear Channel Service consistent with its obligations to do so pursuant to this Agreement over any twelve (12) month period, CSB shall have the right to discontinue such CSB Re-Branded Linear Channel Service upon ninety (90) days written notice to PDMP; (b) if such 3rd party determines that CSB and its affiliates have received actual revenues as a result of the operation of a PDMP Branded Linear Channel Service consistent with its obligations to do so pursuant to this Agreement over any twelve (12) month period of less than one million dollars ($1,000,000) (and in the first twelve month period immediately following the Effective Date, less than one million dollars ($1,000,000) after recoupment of Launch Costs for the PDMP Branded Linear Channel Service), CSB shall have the right to discontinue such PDMP Branded Linear Channel Service upon ninety (90) days notice to PDMP.

3.3     CSB shall have the right to market and promote any Person's products or services via the Services provided by CSB pursuant to this Agreement without PDMP's prior written consent.

## 4.   PDMP OBLIGATIONS

4.1     PDMP shall provide a minimum of one full-page advertisement in every adult oriented magazine PDMP publishes during the Term (i.e., domestic publications only). CSB shall be responsible for the creation and production expense associated with the creation of any advertisement(s). PDMP will provide advertisement specifications and PDMP magazine production timetable information. PDMP shall have the right to approve each advertisement prior to publication. CSB acknowledges that some proposed advertisements may be appropriate for one or more publications but not others. CSB acknowledges that it must comply with PDMP magazine production timetables and specifications and respond promptly to inquiries and requests from PDMP magazine production staff and contractors in order for such advertisements to be included in the magazines.

4.2     PDMP shall provide, subject to availability and 45 days' advance written notice from CSB, at PDMP's reasonably exercised discretion, Penthouse Pet models for PDMP's trade show appearances, scheduled events and photo shoots in connection with the marketing, distribution and sale of the Titles. PDMP shall advance all costs and expenses associated with the Pet models' attendance incurred for travel, hotel accommodation and per diem (food allowance) expenses, the Pet model appearance fees (as of the Effective Date, generally $1,000 per day per model) and a Pet model supervisor fee (as of the Effective Date, generally $500 per event appearance). CSB shall reimburse PDMP for such expenses within thirty (30) days of receipt of PDMP's invoice thereof. CSB acknowledges that PDMP cannot compel Penthouse Pet models to appear.

4.3     CSB shall have the right of first refusal, on substantially the same terms and conditions offered to PDMP by a third party exhibitor, for any PDMP content created or acquired by PDMP during the Term and eligible for use pursuant to this Agreement that either has an X-rating or that is to be Exhibited as Pay Per View content. Once the right of first refusal is exercised, CSB must exhibit such content only via Pay Per View distribution. CSB must select the Title within ten (10) days of its receipt of a screener and the terms and conditions offered, or else it waives its right of first refusal for such Title. For the avoidance of doubt, the right of first refusal does not apply to CSB's right to Exhibit such Title.

INITIALS:   PDMP _____   CSB _____

Event Titles via Video on Demand, as the right to Exhibit Titles, including Events, via Video on Demand is allowed pursuant to CSB's Rights under this Agreement.

4.4     PDMP agrees not to launch, license, or create any service that would directly compete with the PDMP right(s) granted to CSB, in Broadcast Formats for the Territory granted to CSB, as long as such applicable right is in effect. For the avoidance of doubt, traditional mainstream venues such as HBO, Spike TV, "E" TV, etc., and programming that has received or would receive if submitted for rating an R or NC-17 rating from the MPAA, or TV-MA, L and/or S television ratings in its form as delivered by PDMP, will not be deemed competitive for purposes of this Section 4.4. X-rated and PPV Event content is not considered competition for purposes of this Section if CSB has waived or passed on its right of first refusal on such content. PDMP shall not operate or license a linear or VOD branded channel unless CSB has surrendered or forfeited the rights. Notwithstanding the foregoing provisions: (a) any of the competing businesses, entities, services or other elements set forth in Schedule D, which is attached hereto and incorporated herein by reference, that is already operating prior to the time that PDMP acquires them, shall not be prohibited from continuing to offer a competing service; (b) CSB acknowledges PDMP's license agreements with INDemand, L.L.C., and continued performance by PDMP under such agreements shall not deemed to violate the provisions of this Agreement.

## 5.     LICENSE PERIOD; TERM

5.1     The Term of this Agreement shall commence on the Effective Date and shall continue for a period of ten (10) years unless sooner terminated as provided for in Section 9 (the "Term"). The parties shall negotiate with each other in good faith with respect to any extension(s) of the Term.

5.2     Each Title shall be subject to a "License Period" in which CSB may exercise its Rights pursuant to Section 2. The License Period for each individual Title shall be for five (5) years commencing on the date on which such Title is accepted by CSB (as described in Section 6.3). It is understood by the parties that any License Period that commences during the Term shall survive beyond expiration of this Agreement, if any, for the full five (5) year License Period, but shall terminate immediately upon termination of this Agreement, if any. The terms of this Agreement shall govern Titles during such License Periods. The parties may mutually agree in writing to extend or renew any Title's License Period.

## 6.     DELIVERY OF TITLES

6.1     Upon the Effective Date, PDMP shall provide to CSB: (a) one DVD copy of each Title under a Trademark created within the past five (5) years that is eligible for use pursuant to this Agreement; and (b) a list of all other Titles in PDMP's library that PDMP will make available to CSB at PDMP's sole discretion. The list shall include the names, descriptions, running times and dates of production for each Title supplied by PDMP. From time to time during the Term hereof, PDMP and CSB shall mutually identify Titles that CSB shall license from PDMP pursuant to this Agreement and the parties shall record the name of such Titles, the dates of production and sufficiently detailed descriptions of the content of such Titles on a Schedule A that shall be mutually executed by the parties.

6.2     At the beginning of each month during the Term, PDMP shall provide one DVD copy of any new Titles produced under a Trademark within the preceding month and eligible for use by CSB pursuant to this Agreement for CSB's review and selection. PDMP shall be obligated to make available no less than five (5) Titles per month during the Term that have not already been selected for distribution by CSB. PDMP's failure to meet this obligation on a monthly recurring basis shall entitle CSB to either (in CSB's sole and absolute discretion): (a) deduct $16,667 per deficient Title from the Minimum Payment Guarantee after providing PDMP written notice and thirty (30) days to cure the same; or (b) consider such breach an event of default after providing PDMP written notice and thirty (30) days to cure the same. Each month during the Term, at CSB's sole discretion, CSB shall use good faith efforts to select any number of Titles from PDMP's library that PDMP makes available to CSB. Each Title selected by CSB shall be identified with reasonable particularity in Schedule A which is attached hereto and incorporated herein by this reference. The number of Titles greater than five (5) selected by CSB in any month during the Term shall be deemed carried forward or back to one or more months during the Term designated by PDMP to satisfy shortfall, if any, in PDMP's provision of Titles, without incurrence of any penalty for breach.

INITIALS:   PDMP _____   CSB _____

6.3    Within ten (10) days after a Schedule A is submitted by CSB, PDMP, at its sole cost and expense shall provide to CSB in compliance with the technical requirements and specifications set forth in Schedule B the following:

      (a)    (1) Dub of each Title;

      (b)    all additional language audio tracks produced for each Title in digital form with snyc marks or electronic equivalent;

      (c)    complete and accurate Documentation for each Title;

      (d)    (15) cable-action pictures of each female performer in photo CD format;

      (e)    (15) glamour-shot pictures of each female performer (non-nude) in photo CD format;

      (f)    (15) X-action pictures of each female performer in photo CD format;

      (g)    (1) picture of each performer as a facial close up or medium shot in photo CD format;

      (h)    (1) DVD for each Title (unless already provided);

      (i)    (1) trailer in cable version, if available; and

      (j)    complete and accurate documents evidencing or otherwise supporting Licensor's representations under Section 10, if and when available (which documents shall be deemed and treated as PDMP Confidential Information pursuant to Section 23).

A Title shall be deemed accepted by CSB for purposes of this Agreement upon the earlier of the following: (i) CSB uses the Title on a Service; or (ii) PDMP delivers the foregoing elements for such Title and CSB does not within five (5) days of such delivery give PDMP notice in writing of any material deficiency therewith. CSB acknowledges that PDMP may or may not have all of the foregoing elements for its JILL KELLY PRODUCTIONS branded titles; for those titles selected by CSB pursuant to Section 6.2, PDMP will deliver all such elements in its possession. If within ten (10) days of receipt of PDMP's elements for such title and prior to CSB's use of the title on a Service, CSB determines that the elements delivered for such title are insufficient for CSB's use pursuant to this Agreement, then CSB may upon written notice to PDMP deem such title removed from Schedule A, and such title shall not be considered a Title pursuant to this Agreement.

6.4    Upon loss, theft or destruction of any Dub, CSB shall promptly advise PDMP of such loss, theft or destruction by affidavit setting forth the facts thereof.  Replacements will be provided if requested by CSB at the sole cost of CSB.

## 7.    CONSIDERATION

7.1    PDMP shall be entitled to receive the following consideration (each a "License Fee"), as applicable depending upon which Service(s) is/are launched and maintained by CSB:

      (a)    PDMP Branded VOD Service.  CSB shall pay to PDMP thirty percent (30%) of the actual revenues received from such Service by CSB and its affiliates with a minimum payment guarantee to PDMP of one million dollars ($1,000,000) per each twelve (12) month period during the Term, paid in equal quarterly installments in advance of such quarter (the "Minimum Payment Guarantee").  For the avoidance of doubt, if the revenues received by CSB are three million dollars or less during a twelve (12) month period commencing upon the Effective Date or on a subsequent anniversary thereof, PDMP shall receive the Minimum Payment

INITIALS:    PDMP _____    CSB _____

Page 8 of 18

Guarantee.  On the other hand, if the revenues received by CSB exceed three million dollars during a similar period, PDMP shall receive the Minimum Payment Guarantee plus thirty cents on every dollar of revenue above three million dollars received by CSB and its affiliates.

(b)    PDMP Branded Linear Channel Service.  CSB shall pay PDMP thirty-five percent (35%) of the actual revenues received by CSB and its affiliates in connection with the PDMP Branded Linear Channel Service once actual revenues received by CSB and its affiliates exceed the Launch Costs.

(c)    CSB Re-Branded Linear Channel Service.  CSB shall pay PDMP thirty-five percent (35%) of all actual Incremental Revenues received by CSB and its affiliates in connection with such Service after substantial completion of the re-branding and once the Launch Costs have been recouped.

(d)    Marketing of Persons' products and services.  In the event that the revenue received by CSB and its affiliates in connection with the marketing and promotion of one or more Persons' products or services is equal to or greater than ten percent (10%) of the actual total revenue received by CSB and its affiliates in connection with the PDMP Branded Linear Channel Service or the CSB Re-Branded Linear Channel Service, as applicable, in any given year during the Term, such marketing revenue shall be paid to PDMP in the same percentage as is set forth in Sections 7.1(b) and 7.1(c).

(e)    Payments for Titles Used Pursuant to CSB's Right of First Refusal.  CSB shall pay PDMP those revenues and other amounts agreed between them in connection with CSB's exercise of its rights of first refusal pursuant to Section 4.3 should CSB exercise such right.

7.2    Any revenue due and payable to PDMP pursuant to Sections 7.1(b), (c) or (d) shall be paid no later than sixty (60) days after the month in which CSB and its affiliates receive them.  **Time is of the essence** concerning all payment obligations pursuant to this Agreement.  Without limiting PDMP's other remedies for CSB's late payment, CSB agrees to pay interest to PDMP on any sums that have not been received by PDMP within thirty (30) days following the applicable due date.  Such interest shall accrue from the due date until the date of payment and shall be subject to an interest rate of one and one half percent (1.5%) per month or the highest rate permitted by law, whichever is less.

7.3    Each License Fee payment shall include any applicable documentation received by CSB from any applicable Providers that supports the performance of the Services.  CSB shall report all Launch Costs for each Service to PDMP on a rolling monthly basis and promptly shall provide notice to PDMP of CSB's final expenditure of Launch Costs for each Service.  Launch shall be deemed completed six (6) months following the date in which such Service first becomes commercially available to Subscribers.  CSB shall report to PDMP on a monthly basis is progress toward recoupment of Launch Costs for each of the Re-Branded Linear Channel Service and the PDMP Re-Branded Linear Channel Service until recoupment is achieved.

7.4    CSB shall keep true and accurate books of account and records for all revenues, costs (including Launch Costs) and other financial matters concerning this Agreement.  CSB shall permit an independent and neutral third party selected by PDMP to have full access to, and to inspect the same, during normal business hours upon thirty (30) days prior written notice, to enable PDMP and its nominees, employees or agents to examine, and to copy, at PDMP's expense, all such books and records.  CSB shall maintain, in good order and condition, all such books and records for a period of two (2) years after the expiration or termination of this Agreement, or, in the event of a dispute between the parties hereto, until such dispute is resolved, whichever date is later, and such books and records shall be kept at the following address or at such other *bona fide* business address of which CSB notifies PDMP in writing: 7007 Winchester Circle, Suite 200, Boulder, CO 80301.  If an examination discloses an underpayment of amounts owed to PDMP pursuant to this Agreement, such amounts immediately shall be paid to PDMP.  If for the period(s) covered by such examination, CSB has paid less than ninety-five percent (95%) of the amounts actually owed to PDMP for such period, then all of PDMP's reasonable out

INITIALS:    PDMP _____    CSB _____

of pocket expenses incurred in connection with such examination promptly shall be reimbursed by CSB.

      7.5    Each party represents and warrants that no Person is entitled to commission, compensation or other consideration as a broker's fee, finder's fee or similar fee for the consummation or performance of this Agreement other than Coastline Licensing International Inc.

## 8.   TRADEMARK MATTERS

      8.1    CSB agrees that PDMP and its affiliated companies are the proprietors of, and have the sole and exclusive rights to the Trademarks, including the sole right to allow or disallow any other party to use the Trademarks.

      8.2    The licenses, rights and privileges granted herein extend only to the permitted uses of the Trademarks in the Territory. CSB hereby agrees it will not, directly or indirectly, make, authorize, or suffer to be made any other use of the Trademarks without the express prior written consent of PDMP. CSB will not knowingly sell, market, broadcast or distribute the same outside the Territory, or by means inconsistent with those permitted to CSB hereunder and CSB agrees that it will, upon twenty-four (24) hours notice, discontinue sales or distribution to any Person discovered to be reselling, broadcasting or distributing videos of the Titles in or to places outside the Territory or by such inconsistent means to the extent this provision is permitted by the applicable law.

      8.3    CSB shall maintain the validity and distinctiveness of the Trademarks in every permitted use thereof in accordance herewith, and in all advertisements, promotional material and matters of any kind relating thereto. CSB shall use the Trademarks only in the respective forms in which they are authorized and shall not use or authorize the use of an abbreviated form of any of them.

      8.4    CSB shall not, during the Term or at any time thereafter: (i) dispute or contest, directly or indirectly, PDMP's exclusive right, license and privilege to use the Trademarks or the validity of the Trademarks, whether or not registered, or attack the validity of the Trademark license or assist or aid others in so doing; or (ii) file, directly or indirectly, trademark applications or registrations (including internet domain name registrations) for any use of the Trademarks whatsoever in any country unless so authorized in writing by PDMP.

      8.5    CSB shall forthwith assign to PDMP or to any affiliated company designated by PDMP any rights, title and interest it may acquire by operation of law or have in and to any of the Trademarks.

      8.6    All rights in the Trademarks other than those specifically granted herein are reserved by PDMP for its own use and benefit. Upon termination of this Agreement for any reason whatsoever, and upon expiration of this Agreement and all License Periods, all rights and privileges in and to the Trademarks which are the subject of this Agreement shall automatically revert to PDMP. CSB hereby agrees that its every use of the Trademarks shall inure to the benefit of PDMP, and CSB shall acquire no rights therein by virtue of any such use, or presumptive right to continue such use after termination or expiration of this Agreement.

      8.7    Nothing herein shall be construed to prevent PDMP from using, exploiting or granting other licenses for the use of the Trademarks in any manner whatsoever during the Term or any renewals thereof except to the extent that such licenses directly conflict with CSB's exclusive rights set forth in Section 2.

      8.8    Notwithstanding anything herein to the contrary, the Trademarks shall not be used if: their use will violate the trademark laws of the Territory or other laws or regulations; or their use is likely to misrepresent the quality of the third party audiovisual works or the Services rendered pursuant to this Agreement; or the use thereof is likely to impair the reputation and goodwill of PDMP or any affiliated companies or to be contrary to fair trade. It shall not be a violation of this Section 8.8 for CSB to use or associate the Trademark in connection with the distribution of other non-PDMP branded titles on the Services so long as such non-PDMP titles satisfy the quality standards set forth in this Agreement.

INITIALS:    PDMP _____  ,CSB _____

8.9    It is expressly understood by CSB that PDMP grants no license to CSB to use the Trademarks for any purposes other than those specifically described in this Agreement. Without limiting the foregoing, CSB understands that except as specifically provided herein, it may not use any licensed Trademark on the Internet as a domain name (URL) or website name, in the name of its company, or in any way that might intentionally mislead the public. In the event that CSB wishes to use the Trademarks on its letterhead or business cards, it may do so only in conjunction with the name of CSB, the symbol ® or ™, as applicable, must be included next to any use of the Trademarks, use of the Trademarks may not suggest that CSB, its officers or employees are carrying on business under that name except in connection with providing the Services, and any proposed letterhead or business cards using the Trademarks must be in a form previously approved in writing by PDMP. If such permission is granted, CSB shall file with the appropriate governmental agency(s) any required certificates of assumed name and shall provide copies thereof to PDMP. Other than as provided herein, CSB shall not file, maintain or cancel any trade name, business name or fictitious name registrations which include the Trademarks, and shall execute all documents requested by PDMP at PDMP's expense to obtain protection for the Trademarks or to maintain their continued validity and enforceability. At PDMP's request from time to time, CSB promptly will provide PDMP with specimens of trademark use and information requested by PDMP to enable PDMP's application for registration, registration and maintenance of Trademarks.

8.10    CSB acknowledges that PDMP's rights and interest in and to the Trademarks are of a special, unique and extraordinary nature and difficult or impossible to replace. CSB therefore agrees that PDMP, in addition to its other rights and remedies, shall be entitled to have an injunction issued by any tribunal of competent jurisdiction restricting CSB from committing or continuing to commit any violation of this Agreement or the continued use of the Trademarks in violation of the terms and conditions herein. In any such proceeding, CSB agrees that its ability to answer in damages shall not be interposed as a defense and that PDMP will suffer irreparable damages and injury in the event of any breach by CSB hereunder and will not have an adequate remedy at law.

9.    TERMINATION
9.1    Either party may terminate this Agreement by written notice given pursuant to Section 17 and effective on the date set forth therein (i) if the other party is in breach of any material obligation contained herein and such breach has not been cured within fourteen (14) days (or such other period prescribed in this Agreement) after receipt of written notice to cure the same; or (ii) as provided in Section 13 (Force Majeure).

9.2    Either party may terminate this Agreement effective immediately upon written notice given pursuant to Section 17 if (i) the other party files a petition in bankruptcy or if such a petition is filed against such party and such petition is not dismissed within thirty (30) days, (ii) the other party takes advantage of any insolvency law, (iii) the other party admits in writing that it is unable to pay its debts as such debts become due, (iv) the other party makes an assignment for the benefit of creditors, (v) a receiver, liquidator or trustee is appointed in respect of all or a substantial portion of such party's property or affairs, or (vi) the other party suspends or discontinues its operation, whether or not in the normal course of business.

9.3    Any termination under this Section 9 shall be without prejudice to any other rights or remedies that the party terminating this Agreement might have under this Agreement, at law, in equity or otherwise.

9.4    Upon expiration or termination, CSB shall return and deliver to PDMP all Titles and all Versions it has in its possession within thirty (30) days of termination.

9.5    The following provisions of this Agreement shall survive its termination or expiration: Sections 1, 5.2, 6.4, 7, 8, this Section 9, and 11-24. For certainty, Sections 4.3 and 4.4 shall not survive expiration or termination of this Agreement, notwithstanding any License Periods continuing after this Agreement's expiration.

INITIALS:    PDMP _____ ,  CSB _____

## 10.   REPRESENTATIONS AND WARRANTIES

10.1     PDMP hereby represents and warrants that it owns or holds a valid license to all relevant and necessary broadcast and exploitation rights in and for the Rights in the Titles licensed hereunder. PDMP hereby represents and warrants to CSB that all Documentation, including but not limited to proper consent documents is complete and is appropriately maintained by PDMP and may be inspected by CSB or its designated agent upon request upon five (5) business days notice.

10.2     PDMP represents and warrants that it has obtained and will maintain all necessary licenses for the production, synchronization, Exhibition, performance, distribution, marketing and exploitation of the Titles, specifically including but not limited to direct licenses to publicly perform all of the music therein, throughout the Territory and during the applicable License Period for each Title for any and all purposes licensed to CSB hereunder and required for the full, complete and unlimited exercise and enjoyment by CSB of each and all of the rights herein granted to CSB in this Agreement; and PDMP further represents and warrants that all costs of production of each Title, and all artists, actors, musicians and persons rendering services in connection with the production of each Title have been or will be paid any sums due to them by PDMP. PDMP further represent and warrants that it has acquired all music rights and music clearances which are required with respect to the music contained in each Title and that no supplemental or additional use payments shall be required with respect to the exploitation and Exhibition of any Title and/or any advertising or promotion thereof which contains the music embodied in any Title.

10.3     PDMP represents and warrants that it has the right to grant all Rights granted to CSB hereunder; PDMP has not previously and will not during the Term restrict, diminish or otherwise adversely impact the Rights granted to CSB hereunder; the Titles do not violate any right of privacy; the Titles are not defamatory; neither the Titles, the Documentation, nor any parts thereof, nor any materials contained therein or synchronized therewith, nor the exercise of any right granted hereunder, violates or will violate or will infringe any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil, or other property right or right of privacy or any law or regulation or other right whatsoever of, or slanders or libels, any person, firm, corporation, or association whatsoever; all Titles shall be of quality suitable for CSB's exploitation of and all Rights granted to CSB by PDMP pursuant to this Agreement.

## 11.   INDEMNIFICATION AND LIMITATION OF LIABILITY

11.1     CSB shall defend, indemnify and hold harmless PDMP, its officers, directors, affiliates, subsidiaries, employees and agents from and against all damages, liabilities, costs and expenses (including, without limitation, reasonable attorney fees and court costs) arising out of claims or actions by any Person which solely and directly relates to: (a) a breach or alleged breach of CSB's duties or obligations under this Agreement, or (b) CSB's breach or alleged breach of any law.  In the event of any such claim, action or other event, which may give rise to indemnity under this Section, PDMP shall: (a) promptly notify CSB and furnish all pleadings, correspondence, and other documents directly related to the assertion of the claim or cause of action; (b) grant to CSB the sole and exclusive right to defend against such claim or action with counsel reasonably satisfactory to PDMP; (c) fully cooperate with CSB and counsel selected by CSB in the defense of such claim or action; and (d) make no settlement or compromise of such claim or action without the prior written consent of CSB.

11.2     PDMP shall defend, indemnify and hold harmless CSB, its officers, directors, affiliates, subsidiaries, employees and agents from and against all damages, liabilities, costs and expenses (including, without limitation, reasonable attorney fees and court costs) arising out of claims or actions by any Person which solely and directly relates to: (a) a breach or alleged breach of PDMP's duties, representations, warranties or obligations under this Agreement, or (b) PDMP's breach or alleged breach of any law.  In the event of any such claim, action or other event that may give rise to indemnity under this Section, CSB shall: (a) promptly notify PDMP and furnish all pleadings, correspondence, and other documents directly related to the assertion of the claim or cause of action; (b) grant to PDMP the sole and exclusive right to defend against such claim or action with counsel reasonably satisfactory to CSB; (c) fully cooperate with PDMP and counsel selected by PDMP in the defense of such claim or action; and (d) make no settlement or compromise of such claim or action without prior written consent of PDMP.

INITIALS:   PDMP ____   CSB ____

11.3    EXCEPT FOR EACH PARTY'S INDEMNIFICATION AND CONFIDENTIALITY OBLIGATIONS, NEITHER PARTY OR ANY AFFILIATE OR REPRESENTATIVE OF EITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES TO THE OTHER PARTY OR ANY THIRD PARTY (INCLUDING WITHOUT LIMITATION, ANY PAYMENT FOR LOST REVENUES, LOST DATA, LOST PROFITS OR LOSS OF GOODWILL), WHETHER FORESEEABLE OR NOT, FOR ANY CAUSE WHATSOEVER WHETHER OR NOT CAUSED BY A PARTY'S NEGLIGENCE (BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT).  UNDER NO CIRCUMSTANCES SHALL ANY PROJECTIONS OR FORECASTS BY EITHER PARTY BE BINDING AS COMMITMENTS OR PROMISES BY EITHER PARTY OR OTHERWISE GIVE RISE TO ANY LIABILITY.

## 12.    PUBLICITY

The parties agree that all publicity and public announcements concerning the formation and existence of this Agreement shall be jointly planned and coordinated by and among the parties.  Any press release concerning this Agreement or its subject matter proposed by either party to be issued shall be submitted to the other party for its review and written approval at least five (5) business days prior its intended release.  Neither party shall issue any press release which has not been approved in writing and in advance in its entirety by the other party.  A party may respond to unsolicited media inquiries in pursuit of news stories; provided that the party responding shall inform the inquirer that the response is only that of the responding party, and does not necessarily reflect the position or opinion of the other party.

## 13.    FORCE MAJEURE

CSB shall not be liable or responsible for any failure or inability to perform or delay caused by reason of one or more so-called "force majeure" contingencies (e.g., any act of God, fire, earthquake, strike, labor disturbance, civil commotion, acts of government, its agencies, or governmental officers, any order, regulation, ruling or action of any labor union or association effecting CSB or the industry in which CSB is engaged, delays in the delivery of materials or supplies, satellite transponder failure, terrorist attack, any act of sabotage, etc.).  The Term and applicable License Periods for particular Titles shall be extended hereunder for a period equal to the duration of any such force majeure contingencies to the extent that such force majeure contingencies interfere with or disrupt either party's performance of this Agreement; provided that (i) the party afflicted by such contingency (A) promptly notifies the other party of such circumstances and their expected duration; and (B) makes commercially reasonable efforts to work around such circumstances; and (ii) in any event should such circumstances persist for more than twelve (12) months, either party may terminate this Agreement upon thirty (30) days notice to the other.

## 14.    SEVERABILITY

Subject to this Section 14, if any provision of this Agreement or the application thereof to any party or circumstance shall, to any extent, be invalid and/or unenforceable, the remainder of this Agreement and the application of such provision to any other parties or circumstances other than those as to which it is held invalid and/or unenforceable, shall not be affected thereby, and each such other term and provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

## 15.    FURTHER DOCUMENTS

PDMP and CSB shall promptly execute, acknowledge, and deliver or promptly procure the execution, acknowledgment and delivery of any and all further assignments, agreements and instruments which may be deemed necessary or expedient to effectuate or confirm the provisions of this Agreement.

## 16.    WAIVERS

No waiver by either party of any breach or default under this Agreement shall be deemed to be a waiver of any proceeding or subsequent breach or default.

## 17.    NOTICES

All notices or remittances which either party may wish to serve or may be required to serve on the other under this Agreement shall be in writing, and shall be served by personal delivery thereof, or by

INITIALS:   PDMP _____   CSB _____

prepaid certified mail, return receipt requested, or by prepaid overnight air express delivery, addressed to the respective parties at their addresses set forth below, or updated addresses provided by notice to the other party. Any service of legal process in any such action or proceeding may, among other methods, be served upon a party by delivering it or mailing it, by registered or certified mail, or by recognized national courier, addressed to it at the notice address then designated by it, and such service shall be deemed to have the same force and effect as personal service within the State of California.

| If to PDMP: | If to CSB: |
|---|---|
| Penthouse Digital Media Productions Inc.<br>6800 Broken Sound Parkway NW<br>Suite 100<br>Boca Raton, FL 33487<br>Attn: General Counsel<br>Phone: (561) 912-7000<br>Fax: (561) 912-1747 | Colorado Satellite Broadcasting, Inc.<br>7007 Winchester Circle<br>Suite 200<br>Boulder, CO 80301<br>Attn: General Counsel<br>Phone: (303) 381-0207<br>Fax: (303) 381-2369 |

**18.    RELATIONSHIP OF THE PARTIES**
Nothing contained in this Agreement shall be deemed to constitute either of the parties a joint venturer, partner, or agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

**19.    ENTIRE AGREEMENT**
This Agreement contains the full and complete understanding between the parties hereto and supersedes all prior understandings, whether written or oral, pertaining to the subject matter hereof and cannot be modified except by a written instrument signed by the parties hereto.

**20.    APPLICABLE LAWS**
This Agreement shall be governed by the law of the State of California and the federal law of the United States of America applicable therein. In the event of any dispute between the parties, the prevailing party shall be entitled to recover all costs (including reasonable attorneys' fees) from the other party. The parties agree that any dispute shall be resolved in the state and federal courts physically located within the State of California for such purpose and the parties shall submit themselves to the sole and exclusive venue and jurisdiction of the courts therein without protest or challenge.

**21.    ASSIGNMENT**
Neither party may assign or otherwise transfer this Agreement (whether by sale, merger, stock purchase or other operation of law), or all or any part of its rights hereunder to any Person without the express written consent of the other party, such consent not to be unreasonably withheld, conditioned or delayed; provided that either party may assign or transfer this Agreement to its affiliates and to any successor to all or substantially all of its assets.

**22.    COUNTERPARTS**
This Agreement may be executed in counterparts and via facsimile, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

**23.    CONFIDENTIALITY**
The terms and provisions of that certain Non-Disclosure Agreement, by and between New Frontier Media, Inc. including its affiliates and Penthouse Media Group Inc. including its affiliates, dated August 17, 2005 (the "August 2005 NDA"), shall be deemed to apply as concerns the confidentiality of the terms of this Agreement and the financial and other non-public information and communications arising in connection with its negotiation and performance, all of which shall be deemed Confidential Information, and each party deemed a "receiving party" thereof. Notwithstanding the terms of the August 2005 NDA or any other provision set forth in this Agreement, neither PDMP nor CSB shall disclose to any third party

INITIALS:    PDMP _____    CSB _____

(other than their respective employees, agents or representatives in their capacity as such who are advised of and agree to observe the terms of this Section 23 and the August 2005 NDA), any information with respect to the financial terms and provisions of this Agreement except: (i) to the extent necessary to comply with law, including without limitation, any required SEC filings, or the valid order of a court of competent jurisdiction, in which event, the party making such disclosure shall so notify the other, in writing, within five (5) business days, and shall seek confidential treatment of such information, (ii) as part of its normal reporting or review procedure to its parent company, its auditors and its attorneys, provided, however, that such parent company, auditors, and attorneys are advised of and agree to observe the provisions of this Section 23 and the August 2005 NDA, (iii) to the extent necessary to enforce its rights pursuant to this Agreement, and (iv) to any *bona fide* prospective purchaser of the stock or assets of such party who has been advised of and agree to observe the terms of this Section 23 and the August 2005 NDA.

24.   **PARTIES BOUND BY AGREEMENT**
        This Agreement is binding upon the parties hereto and upon their respective successors and permitted assigns.

        **IN WITNESS WHEREOF,** the parties hereto have duly executed, initialed and delivered this Agreement as of the Effective Date set forth above.

COLORADO SATELLITE BROADCASTING, INC.

By: _____
Name: *Michael Werner*
Title: *CEO & EVP*

PENTHOUSE DIGITAL MEDIA PRODUCTIONS INC.

By: _____
Name: *Anthony L Previte*
Title: *President of Entertainment*

INITIALS:    PDMP _____    CSB _____

Page 15 of 18

## SCHEDULE "B"
### BROADCAST SPECIFICATIONS APPLICABLE TO ALL TITLES

1.      All Titles must be provided electronically via hard drive or File Transfer Protocol in DV25 with Quicktime .mov codec, recorded in NTSC format and carry a continuous time code of 30 frames per second (Drop Frame).

2.    All masters must carry a standard split field EIA color bar test with an accompanying 1,000 or 400Hz tone on both audio channels.

3.    Video levels (Luminance/White) must not exceed 100 IRE units at any time during the program. Black levels will measure 7.5 IRE, Sync tip will measure –40 IRE, Color burst will measure between +20 IRE to –20 IRE and 3. 58Mhz.

4.    Chrominance Levels (saturation) must not register outside of legal areas located on the vectroscope and meet F.C.C. standards.

5.    Hue marks must be in the appropriate 2.6 boxes and burst level noted as wither 75% or 100%. Additionally, hue must provide an accurate and continuous skin tone throughout the program.

6.    Audio must be recorded in split-track with Dialogue on Channel #1 and Music & Effects on Channel #2. Audio levels should average 0 dbm and not exceed 3 dbm, and all audio portions of the program must be clear in tone and easy to understand.

7.    All masters shall be configured as follows:

|   |   |   | Stop |
|---|---|---|---|
| A. | Bar Test and Tone | 00:58:30:00 | 00:59:30:00 |
| B. | Black @ 7.5 units | 00:59:30:00 | 01:00:00:00 |
| C. | Statement of Compliance | 01:00:00:00 | 01:00:08:00 |
| D. | Program Start | 01:00:08:00 | 02:24:00:00 (maximum) |

8.    Line-drips, drop-outs, glitches and scratches must not appear in the video portion of the program, and will be accepted only at the sole discretion of CSB.

INITIALS:    PDMP_____    CSB_____

**Schedule C**
**Adult Ratings**

| | X | XX | XXX |
|---|---|---|---|
| Explicit Language (no racial or reference to minors) | * | * | * |
| Female Masturbation (external, no insertion) | * | * | * |
| Girl/Girl sexual activity | * | * | * |
| Flaccid penis-wide shot | * | * | * |
| Vagina-wide shot | * | * | * |
| Oral sex/cunnilingus (no visible contact) | * | * | * |
| Oral sex/fellatio (no visible contact) | * | * | * |
| Flaccid penis-medium shot | * | * | * |
| Vagina-medium shot | | * | * |
| Erect penis-wide shot | | * | * |
| Erect penis-medium shot (waist-to-head) | | * | * |
| Flaccid penis-close up | | * | * |
| Vagina-close up | | * | * |
| Erect penis-close up | | * | * |
| Female masturbation w/insertion (fingers/objects/no bodily fluids) | | * | * |
| Male masturbation (no ejaculation) | | * | * |
| Oral sex/cunnilingus (visible contact) | | * | * |
| Oral sex/fellatio (visible contact) | | * | * |
| Vaginal penetration (inanimate object) | | * | * |
| Vaginal penetration (penis or phallic object) | | * | * |
| Vaginal penetration (digits or tongue) | | * | * |
| Extreme close-up penis/flaccid | | | * |
| Extreme close-up vaginal penetration | | | * |
| Extreme close-up penis/erect | | | * |
| Ejaculation/bodily fluids | | | * |
| Anal Penetration (inanimate object) | | | * |
| Anal Penetration (penis or phallic object) | | | * |
| Anal Penetration (digits or tongue) | | | |

INITIALS:     PDMP _____     CSB _____

**Schedule D**
**List of Competitors Pursuant to Section 4.4**

Falcon
Hustler
Playboy (and all affiliates)

INITIALS:    PDMP _____    CSB _____

# EXHIBIT B

EXECUTION COPY

## FIRST AMENDMENT TO THE LICENSE AGREEMENT

This First Amendment to the License Agreement (this "Amendment"), is made and entered into as of this 28th day of August, 2008 ("Effective Date"), by and between COLORADO SATELLITE BROADCASTING, INC., ("CSB") and PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC. ("PDMP") hereby amends the License Agreement, as defined below. Except as otherwise indicated, defined terms in this Amendment shall have the same meanings as in the Agreement.

WHEREAS, CSB and PDMP entered into the License Agreement dated September 6, 2007 (the "Agreement") pursuant to which PDMP granted to CSB certain rights to perform, display and broadcast certain motion pictures and related content for viewing by adult audiences; and

WHEREAS, CSB and PDMP desire to enter into a separate agreement (the "Event Title License Agreement"), of even date herewith, which will exclusively govern CSB's license of Event Titles on the terms and conditions set forth therein, and

WHEREAS, CSB and PDMP desire to amend the Agreement to delete references to Event Titles, and for other purposes;

NOW, THEREFORE, CSB and PDMP, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, agree as follows:

1.      The Agreement is hereby amended to delete all reference to Event Titles (as defined in the Event Title License Agreement) and/or "Events" (as defined in the Agreement) including all references and obligations by either party concerning the production, delivery, acceptance, exploitation, and payment for Events. These deletions include, but are not limited to (and shall be construed in harmony and in furtherance, and not in limitation, of the provisions of the remainder of this Amendment): Section 1.10 (in its entirety) and the second sentence of Section 3.2.

2. The term "Motion Pictures" in the third line of Section 1.04 shall be deleted and replaced by the term "Titles."

3.      The first sentence of Section 1.27 shall be deleted in its entirety and replaced with the following sentence: "'Title' means an adult themed motion picture or motion picture segment branded under a Trademark that is at least seventy-two (72) minutes in length with a rating of XX or greater ."

4.      Section 4.3 shall be deleted in its entirety.

5.      Section 4.4 shall be deleted in its entirety and replaced by the following which shall be renumbered Section 4.3: "PDMP agrees not to launch, license, or create any service that would directly compete with the PDMP right(s) granted to CSB, in Broadcast Formats for the Territory granted to CSB, as long as such applicable right is in effect. For

EXECUTION COPY

the avoidance of doubt, traditional mainstream venues such as HBO, Spike TV, "E" TV, etc., and programming that has received or would receive if submitted for rating an R rating from the MPAA in its form as delivered by PDMP, will not be deemed competitive for purposes of this Section 4.3. PDMP shall not operate or license a linear or VOD branded channel unless CSB has surrendered or forfeited the rights. Notwithstanding the foregoing provisions: (a) any of the competing businesses, entities, services or other elements set forth in Schedule D, which is attached hereto and incorporated herein by reference, that is already operating prior to the time that PDMP acquires them, shall not be prohibited from continuing to offer a competing service; (b) CSB acknowledges PDMP's license agreements with INDemand, L.L.C. with respect to the following titles only: (INDemand-Hot Choice) BAD GIRLS; HUSBANDS, WIVES AND LOVERS; THE PINK DIARIES; MY FETISH DIARIES; STRANGERS; WATCH ME; (INDemand HD) ALL NUDE OIL WRESTLING; PET OF THE YEAR HEATHER 2007; (INDemand Event PPV) PET OF THE YEAR 2006; PET OF THE YEAR PLAYOFF 2007; PH PRESENTS HEATHER VANDEVEN; PH PRESENTS RENEE AND FRIENDS; PH PRESENTS NAUGHTY GIRLFRIENDS; PH PRESENTS YOUNG HORNY HOTTIES; PH PRESENTS SEXY PETS BEHAVING BADLY; PH PRESENTS HORNY MILFS AND YOUNGER MEN, and continued performance by PDMP under such agreements regarding the aforementioned titles shall not be deemed to violate the provisions of this Agreement."

6. Section 7.1.(e) is deleted in its entirety.

7.. All the terms and conditions set forth in the Agreement shall remain in full force and effect, except to the extent that such terms and conditions are modified by or in conflict with the provisions of this Amendment, in which case this Amendment shall prevail. Subject to the foregoing, this Amendment, and the Agreement (including all other amendments, addenda, schedules and exhibits thereto) shall be deemed one in the same document.

ACCEPTED AND AGREED as of the Effective Date:

Penthouse Digital Media Productions, Inc.

By: _____

Name:   Anthony L. Previte
Title:    Chief Operating Officer

Colorado Satellite Broadcasting, Inc.

By: _____

Name: Ira Bahr
Title:    Chief Operating Officer

CSB PDMP Amendment No. 1  8-28-08                                      2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV11- 10068 PSG (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X]  **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ]  **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ]  **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address: Alan L. Isaacman, Bar no. 42273
Steven H. Blackman, Bar no. 93528
Isaacman, Kaufman & Painter, P.C.
10250 Constellation Blvd., Ste. 2900
Los Angeles, CA  90067
310/881-6800

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Colorado Satellite Broadcasting, Inc., a Colorado corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>Friendfinder Networks, Inc. Penthouse Digital Media Productions, Inc. and Penthouse Entertainment,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV11- 10068 PSG (Ex)<br><br><br>SUMMONS |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Alan L. Isaacman_____, whose address is _10250 Constellation Blvd., Ste. 2900, Los Angeles, California 90067_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: December 5, 2011                      By: _____
                                             JULIE PRADO
                                             Deputy Clerk

                                             (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                           SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| COLORADO SATELLITE BROADCASTING, INC. | FRIENDFINDER NETWORKS, INC., PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC., and PENTHOUSE ENTERTAINMENT |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Alan L. Isaacman, Steven H. Blackman, Isaacman, Kaufman & Painter, P.C., 10250 Constellation Blvd., Suite 2900, Los Angeles, CA 90067 Tel: (310) 881-6800 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☑ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No  ☑ MONEY DEMANDED IN COMPLAINT: $ in excess of $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Act
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Info. Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☑ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 American with Disabilities - Employment
- ☐ 446 American with Disabilities - Other
- ☐ 440 Other Civil Rights

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus/Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE / PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety /Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

## CV11 10068

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Colorado |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Penthouse Digital - New York and Florida<br>Friendfinder - Nevada and Florida<br>Penthouse Entertainment - New York, Nevada and/or Florida |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date December 5, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |